117 So.2d 482 (1960)
James E. BROOKS, Appellant,
v.
STATE of Florida, Appellee.
Supreme Court of Florida.
January 27, 1960.
*483 John H. Evans, West Palm Beach, for appellant.
Richard W. Ervin, Atty. Gen., and George R. Georgieff, Asst. Atty. Gen., for appellee.
DREW, Justice.
Shortly before 3:00 o'clock on the afternoon of the 2nd of May, 1958, the body of Helen Louise Baier, an employee of the Western Union Telegraph Company in Palm Beach, Florida, was discovered adjacent to the women's toilet in the rear of the Western Union office. An examination of the body established that death had been caused by several blows on the head with a heavy object. There was a pool of blood in the bathroom and in the vicinity of the deceased's head just outside the bathroom door.
An investigation by the company officials and the law enforcement officers of the town and county revealed that the sum of $1201.35 had been removed from the office safe. The fact was further established that Miss Baier had died shortly prior to the time of the discovery of the body.
James E. Brooks, the appellant here, had been employed by the Telegraph Company for some time prior to the accident as a janitor, working in both the West Palm Beach and Palm Beach offices. Following an extensive investigation by the law enforcement officials, Brooks was indicted for the murder, was tried and convicted and sentenced to death by electrocution. This appeal is to review the verdict and judgment of guilt and the sentence of death.
A narrative of the details of the evidence in this case would serve no useful purpose. Suffice it to say, at the time of appellant's arrest after several days' disappearance, the sum of $649.00 in bills of the same denomination as those missing from the Western Union office were discovered in his pocketbook. He first confessed to having participated in the robbery, although he asserts, involuntarily; to having received about $600.00 as his part of the proceeds. In the first confession, he placed the blame upon a friend of Miss Baier, a used car dealer from Miami. In the second confession made in Miami, he repudiated the first confession made the night of his arrest in Palm Beach County; exonerated the friend of Miss Baier whom he had previously charged, and gave a full and complete account of the events leading up to the murder, the murder itself and the events which followed. The substance of his confession *484 was that he was in financial difficulties because of two delinquent installments due on his automobile. He procured a length of pipe and when Miss Baier came out of the bathroom, struck her over the head, knocking her to the floor and after she had fallen, struck her twice more with the iron pipe. He stated he then took the money out of the safe, returned to West Palm Beach, hid some of the money in a can under his house, redeemed his automobile, gave his girl friend $20.00 and later $75.00 and, later, becoming frightened as to what might happen, went to his uncle's house some distance in the country where he was later apprehended.
In addition to these two confessions, both of which were signed by him, and to which we shall refer in greater detail hereafter, he executed two instruments. One of these was to the effect that the sum of $649.00 which was found by the Sheriff when he was arrested and the further sum of $75.00, which he had given to his girl friend, was the property of the Western Union Telegraph Company. The other instrument was to the effect that he was indebted to the Western Union Telegraph Company in the sum of $1201.35 and that he consented to the reduction of said indebtedness by applying his last weeks' wages of $42.86, which he had earned, and accrued vacation benefits in the sum of $88.92 toward the satisfaction of said indebtedness. These instruments were signed while he was in the county jail some two weeks after his incarceration in the presence and at the request of a Mr. West, his employer's agent, and John Farrell, Esq., the attorney for the company.
Appellant first contends that the confessions were improperly allowed in evidence because they had been obtained by direct or implied promises.
The law requires that in order for a confession to be admissible in evidence, the mind of the defendant, at the time of the making of said confession, be free to act uninfluenced by either hope or fear. A confession should be excluded if the attending circumstances or the declarations of those present at the making of the confession are calculated to delude the prisoner as to his true position or to assert improper and undue influence over his mind.[1] A confession is not rendered involuntary, however, merely because the defendant was told he should tell the truth and that it would be better for him if he did so.[2]
A meticulous examination of the record here leaves no doubt in the minds of this Court that the confessions introduced in evidence in this case were freely and voluntarily made without inducement of hope, fear or other illegal influences. The evidence with reference to the voluntary nature of these confessions is overwhelming. The appellant himself on several occasions stated that he was never at any time mistreated nor in any way threatened by the officials, officers or anyone else who was present when the confessions were taken. The record establishes conclusively that, after the second confession was made in Miami, he read and initialed each page and in his own handwriting noted on the bottom thereof "I have read this statement of mine and it is the truth." He denied that the statement was read to him and asserted that because of his third grade education he had difficulty in reading but the evidence is overwhelming that the statement was actually read to him. Moreover, we think the conclusion is inescapable that the appellant was able to read the typewritten transcript of what he had said because, in his first confession, it clearly appears that he himself corrected in his own handwriting one statement which was transcribed. In answer to a direct question he said he could read.
*485 It is strongly urged by the appellant that at one point in taking the second confession he was told that the purpose of taking the formal statement was for his own protection. From this, the appellant reasons that such statement by the officer taking the confession destroyed the voluntary nature of it and rendered it inadmissible as having been obtained through inducement or hope. A study of the record in this respect, however, establishes the statement of the officer that the taking of the formal statement was for his (the defendant's) protection was qualified by further stating that by having the statement reduced to writing it would be in the own words of the defendant and that it would prevent a distortion of anything that he said or from adding anything to what he said. The complete answer given to the question as to whether the defendant was told that it was being taken for his protection is as follows:
"A. I told him that the purpose of taking a formal statement was for his protection, but everything that had transpired there was in his own words, the truth, and that the purpose of taking his statement was to get everything down just exactly the way he said it."
We find nothing improper in such statement nor any inference that could lawfully be drawn from such a statement that would have in any way detracted from the voluntary nature of the confession itself.
The second confession was taken at the court house in Miami where the defendant was taken when he indicated he would like to take a lie detector test. The defendant's request to take such a test was precipitated by a similar request of the friend of Miss Baier whom the defendant had accused in his first confession of committing the crime but who later was established to have been in Miami at the time of the crime engaged in negotiating the sale of a used car to an F.B.I. agent. Upon arriving in Miami and before any lie detector test was actually made, the defendant voluntarily decided to make a full and complete confession which he then did. The confessions, coupled with the Western Union receipts, the authenticity of which were beyond question, clearly establish the fact that this defendant was the perpetrator of the crime for which he was charged and convicted. At the time the Western Union receipts were delivered to him for signature, he voluntarily told his employer, Mr. West, who presented them to him, that he had committed the crime, had taken the money and that he didn't know what made him do it. Mr. West so testified as did Mr. John Farrell, who was present when the statements were made. We, therefore, conclude that the confessions and the Western Union statements were freely and voluntarily made and that the trial judge was eminently correct in allowing them to go to the jury.
Several photographs showing the body of the deceased and the surroundings in which it was found were allowed in evidence. The defendant contends that these photographs show nothing more than a gory scene, tended to prove no material issue and were highly prejudicial to the defendant.
Photographs of the type involved here should be received in evidence with great caution and should not be permitted unless they prove or tend to prove some material issue in the trial of the cause. While the photographs in this case present a gruesome scene of the deceased lying on the floor in a pool of blood adjacent to the bathroom, there is no contention that such photograph does not exhibit the actual scene as it existed when the body was discovered.[3] Moreover, these photographs were clearly admissible for the purpose of establishing the truthfulness of the first confession and the second confession both *486 of which were repudiated by the defendant. The photographs show the location of the body to be in the almost identical position where it would have been found under the version of the murder as given by the defendant in his second confession and the version given by the defendant in his first confession. This being true, and such photographs being admissible for the purposes above mentioned, the fact that the scene presented is one which would likely arouse the passion and prejudice of the jury does not render them inadmissible.[4]
We cannot agree with the contention of the appellant that the State had failed to prove the corpus delicti before the alleged confessions were admitted into evidence. The corpus delicti in criminal cases involves (1) the fact of death and (2) the existence of the criminal agency of another as the cause of death, connected with (3) the identity of the deceased.[5] At the time these confessions were offered in evidence, it had been clearly established that Miss Baier had met her death at the hands of the criminal agency of another and that was all that the law required.
We have carefully considered the other assignments of error raised by the appellant and the questions presented for our consideration in the able and carefully prepared brief and at the bar of this Court. We find no basis in them separately or severally which would justify a reversal of this cause. Moreover, this being an appeal from a judgment sentencing the appellant to death, we have carefully combed this record to discover any error which might have occurred during the course of this trial but which may not have been assigned and argued. We find none. In addition thereto, we have, as required by F.S.A. § 924.32(2), reviewed the whole evidence for the purpose of determining if the interests of justice require a new trial.
The record in this cause establishes that this appellant was represented by able counsel in the trial of this cause in the trial court and in the presentation of this appeal here. He has had the benefit of every safeguard to assure him a fair and impartial trial under the law. He has been duly convicted by a jury upon evidence which clearly establishes his guilt beyond a reasonable doubt.
The judgment is affirmed.
THOMAS, C.J., and TERRELL, HOBSON, ROBERTS, THORNAL and O'CONNELL, JJ., concur.
NOTES
[1] Simon v. State, 1853, 5 Fla. 285, 296; Harrison v. State, 1943, 152 Fla. 86, 12 So.2d 307.
[2] 2 Underhill's Criminal Evidence, Section 388 (5th Edition 1956).
[3] Lindberg v. State, 1938, 134 Fla. 786, 184 So. 662; Mardorff v. State, 1940, 143 Fla. 64, 196 So. 625; Thomas v. State, Fla. 1952, 59 So.2d 517 and Sanford v. State, 1925, 90 Fla. 337, 106 So. 406.
[4] 2 Wharton's Criminal Evidence, p. 686; Mardorff v. State, supra, note 3.
[5] Hulst v. State, 1936, 123 Fla. 315, 166 So. 828; Deiterle v. State, 1931, 101 Fla. 79, 134 So. 42; Lee v. State, 1928, 96 Fla. 59, 117 So. 699.